*In re* MARRIAGE OF HELEN ELIZABETH BENZ, Petitioner-Appellee, and CURTIS MARVIN LEE BENZ, Respondent-Appellant.

Fourth District   No. 4—87—0500

Opinion filed January 28, 1988.

274

Ronda D. Taylor Glenn, of Jennings, Novick, Eggan & Ostling, of Bloomington, for appellant.

B. McLean Arnold, of Bloomington, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Respondent appeals the award of marital and nonmarital assets ordered by the circuit court of McLean County in a final judgment of dissolution of marriage entered July 10, 1987. Respondent raises three issues for our consideration: (1) whether petitioner sufficiently rebutted the presumption of transmutation to marital property where nonmarital funds previously held in a separate trust were transferred during the marriage to a joint trust; (2) whether the trial court properly assessed a marital property value to respondent's pension rights; and (3) whether the court properly divided all marital property in just proportions under section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)). We affirm.

The petitioner Helen Elizabeth Benz (Helen) filed a petition for dissolution of marriage on July 3, 1986. The court granted a dissolution on April 3, 1987, and at that same time also expressly reserved entry of judgment until a hearing could be conducted on all other matters, including issues of property. Following such a hearing, the

court entered its findings in a July 7, 1987, opinion, later memorialized in a final judgment order entered July 10. It is the trial court's assessment and division of marital and nonmarital property which is contested by respondent Curtis Marvin Benz (Curtis) here.

The parties were married on November 14, 1969. On July 1, 1986, Helen left the marital residence and filed her petition for dissolution of marriage two days later. Both Helen and Curtis had two natural children from previous marriages. No children were born to them during their marriage. At the time the dissolution proceedings were underway, Curtis was 61 years of age, and Helen was 64. Both are in good health, although Helen had experienced a previous bout with lymphoma cancer which was currently in remission.

The couple purchased their marital residence in joint tenancy during 1976. A good portion of the down payment originated from money Helen received after the sale of her mother's home. Helen's mother and Curtis' father lived with them in this house at different times over the years, also contributing money to the household while they resided there. Helen's mother suffered from various ailments and remained in the home for approximately six months out of every year during 1976 through 1982. Curtis' father suffered a debilitating stroke in 1983 and moved into the parties' house after a stay in the hospital. Helen, a registered nurse, remained in the home for his care. Helen had previously resigned from her position at Brokaw Hospital in 1977. When the burden upon Helen to care for him became too great, Curtis took early retirement from the General Electric Company (GE) in October of 1983. Curtis had been employed by GE continuously from 1952 until the time of his retirement, at all times contributing to the company's pension plan.

The first disputed point involves transference of $100,000 from a trust singularly maintained by Helen to the couple's joint trust account. To resolve this issue we must trace the $100,000 as it was detailed by testimony before the trial court.

During the summer of 1982, Helen received a check totalling $161,037.74 as her share of the proceeds from the sale of a family farm. Of this amount, $5,000 was given to each of Helen's two sons and Curtis' two daughters. Curtis advised Helen to place an additional $31,037 in their joint savings account as an amount he estimated would cover anticipated inheritance taxes. Taxes on the inheritance were assessed at $21,119.64, with total taxes for the year amounting to $27,481.78. After payment of taxes, the remaining funds from the $31,037 setoff were placed in the couple's profit cash account in joint tenancy.

After these transactions, a total of $110,000 was left over from the original $161,037. Helen placed this amount in trust in her name only (the Helen Benz trust), $10,000 was placed in one certificate of deposit within the trust, while the other $100,000 was set up in a second certificate. Interest earned from the trust was paid to both parties and was deposited in either their profit cash, joint checking, or joint savings accounts. The terms of the Helen Benz trust provided that upon her death, should Curtis survive her, he would receive one-third of the trust income for life, with one-third shares also going to Helen's two sons. Upon Curtis' death the principal of the trust would then be equally distributed between her two sons or their lawful heirs.

In January of 1984, when the rolled-over $10,000 certificate was about to mature, Helen wished to use that money to buy herself a new car. The vehicle she ordered was not delivered until July of 1984, at which time she used the entire $10,000 as the majority of a cash payment on the car. Although she testified she intended the automobile to be hers alone, title to it was jointly held. The trial court deemed the car marital property, a finding not expressly contested on appeal.

There remained the second $100,000 certificate in the Helen Benz trust. In January of 1985, that entire sum was transferred from the Helen Benz trust to an already-existing second trust set up on behalf of both petitioner and respondent (the joint trust). The parties take divergent views as to why this transfer was made. They agree in November of 1984 one of Helen's sons came to them seeking aid in paying off some $8,000 in debts. Curtis initially objected to advancing Helen's son the money, believing it was a "cardinal rule" between them that if they gave one of their four children money, the others should also be given the same amount. One version of events was that Helen then offered to take the entire $100,000 out of her trust when the certificate matured in January, and to place it in the marital trust, if Curtis agreed to help her son out of his financial difficulties. Curtis acquiesced, withdrew $8,000 to pay the son's creditors, and the $100,000 was transferred into the joint trust two months later.

Helen related that Curtis kept "pestering" her to place the $100,000 in the marital trust. Helen stated she finally agreed to the transfer in order to keep peace in the family, as Curtis had become increasingly verbally abusive. She also recalled they discussed how any inheritance Curtis would receive from his father would similarly be placed into the marital trust if she transferred the $100,000. How-

ever, Helen testified it was never her intent to make a gift of the $100,000.

The trial court in its July 7, 1987, opinion agreed petitioner had rebutted the presumption of gift to the marital estate by her transfer of the entire $100,000 certificate of deposit to the joint trust. The court in reaching its determination relied on petitioner's lack of business acumen, her desire to placate her husband, and her dependence upon his judgment and advice as evidenced over the years. The court noted respondent had required petitioner to deposit more than was necessary in a joint account to pay off the income tax liability on the sale of the farm, but would not allow the difference which remained in a cash profit account to be used to retire the son's debts. Respondent also apparently conditioned his release of their joint funds for the son's benefit upon petitioner's promise to convert her certificate into the joint trust. Concluding respondent's control over petitioner's affairs "has been clearly demonstrated," the court declared the $100,000 certificate to be nonmarital property belonging to the petitioner.

Respondent disputes these findings, asserting the record clearly shows transmutation of the nonmarital funds to the marital partnership, and a lack of evidence to refute the presumption that Helen intended to make a gift of those assets.

■■ ■ Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) requires a court to classify property as either marital or nonmarital in order to assign or divide it upon a marriage dissolution. (Ill. Rev. Stat. 1985, ch. 40, par. 503.) As a general rule under the statute, property acquired by either spouse after the marriage, but prior to a judgment of dissolution, is presumed marital property regardless of how title is actually held. (Ill. Rev. Stat. 1985, ch. 40, par. 503(b); *In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E. 2d 635.) This same section excepts certain property from the general rule, including "property acquired by gift, legacy or descent." (Ill. Rev. Stat. 1985, ch. 40, par. 503(a)(1).) That which is designated nonmarital property under the exceptions to section 503(a) may still, however, be presumptively transmuted to marital property by affirmative act of the contributing spouse. (*In re Marriage of Smith* (1981), 86 Ill. 2d 518, 427 N.E.2d 1239; *In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 453 N.E.2d 1357.) The principle of transmutation is based on the presumption that the owner of the nonmarital property intended to make a gift of that property to the marital estate. (*In re Marriage of Olson* (1983), 96 Ill. 2d 432, 451 N.E.2d 825; see generally Feldman & Fleck, *Taming Transmutation:*

*A Guide to Illinois' New Rules on Property Classification & Division Upon Dissolution of Marriage*, 72 Ill. B.J. 336 (1984).) The placing of nonmarital property in joint tenancy or some other form of coownership with the other spouse will raise a presumption that a gift was made to the marital estate, and the property will become marital property. (*Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465, *cert. denied* (1982), 456 U.S. 905, 72 L. Ed. 2d 162, 102 S. Ct. 1751.) This presumption in dissolution proceedings may still be rebutted by the " 'donor' " spouse with "clear, convincing and unmistakable evidence." *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, 257, 483 N.E.2d 316, 320; see also *In re Marriage of Wojcicki* (1982), 109 Ill. App. 3d 569, 573, 440 N.E.2d 1028, 1030.

Here the money distributed to Helen upon the sale of the family farm would fall within the gift, legacy or descent exception in section 503(a)(1). (Ill. Rev. Stat. 1985, ch. 40, par. 503(a)(1).) The $100,000 separately maintained in the Helen Benz trust retained that classification. However, as the trial court correctly noted, once the money was transferred to the joint trust, a presumption of transmutation and of gift to the marital estate arose which could only be rebutted by clear and convincing evidence. The question then becomes whether petitioner presented evidence sufficient to rebut the presumption.

■ The trial court as trier of fact heard the testimony in this matter and was best able to observe the demeanor of the witnesses as they testified. The court relied upon respondent's control over petitioner's financial matters, his insistence the money be transferred, and petitioner's attempts to appease her husband while at the same time giving her son the money to alleviate his represented financial difficulties. It is the trial court's function to resolve conflicting testimony by assessing the credibility of witnesses and the weight to be accorded to their testimony. A court's findings will not be disturbed unless against the manifest weight of the evidence. (*Wojcicki*, 109 Ill. App. 3d 569, 440 N.E.2d 1028; *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.) The trial court resolved any conflicts in favor of the petitioner. We do not believe the court's decision that petitioner had rebutted the presumption of gift was an abuse of discretion. From the time at which she received the money from the sale of her family farm—less those amounts paid out to the children and kept separate for income tax purposes—petitioner had at all times exhibited a clear intent to keep the funds separate. The terms of the trust itself further evidenced petitioner's desire, as respondent was to obtain the interest alone from it, and not the cor-

pus. It was only upon respondent's insistence at a time when the marriage was admittedly deteriorating and the petitioner's son needed money that the $100,000 was transferred.

Error is further claimed according to the court's other findings regarding transmutation. Respondent asserts it is inconsistent for the trial court to have ruled Helen's other nonmarital assets which were subsequently reduced to a form of co-ownership did constitute marital property, while the $100,000 certificate did not. For example, the $10,000 removed earlier from the Helen Benz trust was used to purchase a new automobile for petitioner. The court later assigned the car a marital property value, even though petitioner similarly insisted she had not intended to make a gift of it. However, title to the automobile was jointly held, and petitioner's assertions she was unaware of how joint title came about were held insufficient to rebut the underlying presumption of transmutation. Regarding the $100,000, the money was still kept in a certificate, and only interest from it was used in the marital partnership, just as before. While ownership of the trust was changed to now include respondent, the court found petitioner had provided sufficient explanation why this occurred, and why gift was not her intent. A gift can only be a voluntary, gratuitous transfer of property with the requisite intent to irrevocably deliver (*In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 453 N.E.2d 1357), and such was not clearly exhibited here. We find no abuse of discretion in the court's ruling in this regard.

Respondent next maintains the trial court did not assign a proper value to the pension he earned during the marriage in allocating marital property. The court heard the testimony of two expert witnesses on the subject, each of whom offered different formulations as to the marital value of respondent's pension rights. The court chose the higher of the two.

Decisions of this State have firmly established that pension rights, whether matured, vested, contributory or noncontributory, constitute property "acquired" during the marriage under section 503 of the Act. (*In re Marriage of Hobbs* (1982), 110 Ill. App. 3d 451, 455, 442 N.E.2d 629, 632.) An employee-spouse's contractual right to a pension plan is thus marital property subject to division under the Act to the extent such rights accrued during the marriage. (*In re Marriage of Fairchild* (1982), 110 Ill. App. 3d 470, 442 N.E. 2d 557; *In re Marriage of Coram* (1980), 86 Ill. App. 3d 845, 408 N.E.2d 418.) Problems arising in this area have involved placing a present value on pension rights as well as determining the marital portion of those rights. There is no way the other spouse may be ac-

corded some defined interest to a benefit without first determining its value to the employed spouse during the marriage. *In re Marriage of Evans* (1981), 85 Ill. 2d 523, 426 N.E.2d 854.

■ Courts have followed two basic methods in dividing these interests. The first, termed the "reserved jurisdiction" method, allows the court to delay actual division of the pension by entering an order stating how it will be divided "if, as and when" it is actually paid out. (*In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511.) This method is best employed where it is difficult to place a present value on a pension due to uncertainties regarding vesting or maturation. (78 Ill. App. 3d 653, 397 N.E.2d 511.) The second approach is referred to as the "total offset" method and was the one utilized below. A trial court under this scheme must determine the actual value of the pension according to actuarial evidence, discounting an amount in light of the risk that the pension will not vest, discounting also to present value, and then determining the marital portion of that amount. (*In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 437 N.E.2d 1300; *Hunt*, 78 Ill. App. 3d 653, 397 N.E.2d 511.) Usually expert testimony will be required, and the approach itself is most often utilized where retirement is imminent and there are sufficient other assets to allow an offset to the "nonpensioner" spouse. *Wisniewski*, 107 Ill. App. 3d 711, 437 N.E.2d 1300.

Both parties have already taken early retirement. Respondent's contributory pension rights vested and matured at the time of the dissolution proceedings and were more easily susceptible to valuation by the "total offset" approach than under most other circumstances.

■ Two experts, both certified public accountants, testified on behalf of each party as to the marital value of the respondent's pension. Richard Mehall, Helen's expert, first calculated the net present value of Curtis' pension from GE to be $71,259.44 as of April 1, 1987. Factors Mehall relied upon in reaching this value included the gross monthly pension Curtis was currently receiving as well as what he would receive once he turned 65, life expectancy tables for a white male at the age of 61, and interest rate calculations based on the applicable rates published in a Federal tax service. Mehall also viewed Curtis' paycheck stubs for the years 1970 through 1983—the years the couple were married until the time Curtis retired—in order to determine the total contributions he had made to the pension plan during the marriage. These contributions increased during Curtis' latter years of employment as his pay scale also increased. His total contributions during the entire term of his employment were $8,056.56. The amount he contributed to the plan during the years

1970 through 1983 was $5,746.54, or 71.33% of the total. Mehall assumed the remaining $2,310, or 28.67% of the $8,056.56, was paid into the plan prior to the marriage. Using these fractional components based on employee contribution, Mehall arrived at a marital value for the pension of $50,829.36, or 71.33% of the total he had contributed during the entire length of his employment.

Mehall also admitted there were other generally accepted methods of determining the marital value of a pension, including using a multiplier based upon longevity of service rather than proportion of dollars paid into the plan. It was Mehall's opinion, however, that while both methods were based on sound accounting principles, the contribution or dollars method represented a much more accurate means of ascertaining actual marital value. He further believed this approach arrived at a more correct correlation of representative values. Mehall did admit he was not advised as to exactly how the GE pension plan worked. The plan was never introduced, and he relied solely on the paycheck stubs.

However, using the alternative valuation formula based on length of service, Mehall first stated he first arrived at a net present value of $69,030. There is no indication in the testimony or record, however, as to why a $2,000 discrepancy exists between the present values based on use of the different formulas, or even how Mehall arrived at the $69,030 figure. Mehall then arrived at a fractionalized component based on the number of years and months married while employed as against the total number of years and months he worked for GE. As the parties were married for 47.06% of the total time Curtis worked for GE, Mehall multiplied this figure by the total present value to set the marital value of the pension at $32,499 under the longevity or length of time approach. All figures were again calculated as of April 1, 1987, or about the time the court found sufficient grounds to enter a judgment of dissolution. Thus there was almost a $17,557.56 difference in the results from these two formulas.

Bruce Holtz testified on Curtis' behalf. He stated there are several formulas and alternatives available to determine how the net present cash value of pension rights is to be split into marital and nonmarital portions once net value is arrived at. The biggest assumption in discounting a number to present value, Holtz continued, is the interest rate used.

It was Holtz' opinion that while the contribution and longevity methods are both acceptable, the longevity formula is the far preferable means of assigning marital and nonmarital values to pension rights. Holtz testified a pension is usually contributed to by both the

employee and employer, with interest being earned on the funds also reinvested in the plan. Although an employee's contribution based on pay scale will increase over the years as his gross earnings also increase in the normal case, the contribution method fails to take into consideration that contributions made prior to the marriage have benefitted from a far longer time span in which to earn interest. For that reason Holtz concluded the years or longevity approach "is the more appropriate method *** to get the value of how the pension was actually earned."

From this conflicting expert testimony the trial court chose the valuation based on the contribution method, and allocated $50,829.36 as the marital value of Curtis' pension in dividing up the marital assets. Respondent asserts this was error, particularly since appellate decisions of this State have sanctioned the use of the so-called longevity method, while none have specifically utilized the contribution approach. Petitioner essentially counters each method represents accepted accounting principles, and the trial court was free to choose one over the other after hearing expert testimony on the subject.

In *In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511, the appellate court first adopted the following formulation in cases where the present value of a pension interest is to be determined:

> "The amount of the pension or profit-sharing interest included as marital property would then be the present value of the interest multiplied by a fraction whose numerator is the number of years (or months) of marriage during which benefits were being accumulated, and whose denominator is the total number of years (or months) during which benefits were accumulated prior to divorce. Once the trial court has determined the present value of that part of the pension or profit-sharing interest which is marital property, the trial court may award the interest to the employee spouse and give the nonemployee spouse other marital property to offset her marital share in the interest." (78 Ill. App. 3d at 663, 397 N.E.2d at 519.)

This method has been embraced in other appellate court decisions. See *In re Marriage of Campise* (1983), 115 Ill. App. 3d 610, 450 N.E.2d 1333; *In re Marriage of Bodford* (1981), 94 Ill. App. 3d 91, 418 N.E.2d 487.

It appears the longevity formula is currently the most widely used and generally accepted approach in the Illinois courts. That does not mean any other admittedly sound approach must be rejected in all circumstances. The court as trier of fact heard the expert testi-

mony and chose one method over the other as a more accurate assessment of valuation. Each was testified to as representing generally accepted alternative methods. The trier of fact may accept one opinion as to value while impliedly rejecting the other. A trial court has broad discretion in the valuation and subsequent distribution of marital assets as to marital assets. (*In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 478 N.E.2d 1068.) Absent an abuse of discretion whereby no reasonable man could adopt the trial court's position, a reviewing court will not substitute its judgment for the lower court's disposition in marital property matters. *In re Marriage of Flemming* (1986), 143 Ill. App. 3d 592, 595, 493 N.E.2d 666, 668; *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 88, 458 N.E.2d 1360, 1362.

■ We would have preferred to see evidence depicting how the GE plan was designed. For example, it may have made a great difference here if GE's pension rights were based primarily according to either years of service or total contributions to the plan. Both Mehall and Holtz indicated they were unaware of exactly how the plan operated or how monthly pension payments were arrived at. Respondent himself admitted he did not know if the plan was funded dependent on years of service or amount of money earned over the years, although he believed the former was the case.

It is the obligation of the parties to provide sufficient information to the trial court in marital property valuation matters. A reviewing court will not reverse and remand for further proceedings where a party had ample opportunity to do so but failed to offer such proof. (*In re Marriage of Caldwell* (1984), 124 Ill. App. 3d 898, 465 N.E.2d 523.) Parties should not be allowed to benefit on review from a failure to introduce evidence at the trial level. (*In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 458 N.E.2d 1360.) We believe the court's valuation of respondent's marital pension rights was reasonable under the circumstances and testimony. It would serve no useful purpose to remand or otherwise redetermine the value of those rights. See *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 448 N.E.2d 545.

■ Finally, respondent contends the trial court failed to divide the marital property "in just proportions" pursuant to section 503(d). (Ill. Rev. Stat. 1985, ch. 40, par. 503(d).) Respondent specifically claims the court's equal allotment of marital property to each party not only failed to take into consideration Helen's more substantial nonmarital assets, it also failed to consider all relevant factors enumerated under section 503(d). Respondent believes there is a signifi-

cant disparity in each party's yearly income potential according to the distribution of property ordered by the court.

The court divided the marital estate as follows:

| | Petitioner | Respondent |
|---|---|---|
| IRA Accounts | $5,458.00 | $5,458.00 |
| U.S. Series E Savings Bonds | 6,758.00 | 6,758.00 |
| U.S. Series EE Savings Bonds | 436.00 | 436.00 |
| Pensions (assigned present marital values) | 11,920.45 | 50,829.36 |
| Automobiles | 8,650.00 | 2,500.00 |
| Home Equity | | 45,214.00 |
| General Electric Stock | | 1,600.00 |
| Crypts | | 3,500.00 |
| Life Insurance | 4,248.00 | |
| Marine American Bank | | 500.00 (extra withdrawn) |
| Certificates of Deposit (allocated to equalize the distribution of assets) | 99,341.95 | 20,516.04 |
| | ———— | ———— |
| TOTALS | $136,812.40 | $136,811.40 |

No maintenance was awarded either party, as the court deemed both possessed sufficient liquid assets to adequately provide for their needs. No attorney fees were assessed. Respondent was given the marital home as well as the continuing mortgage obligations.

Section 503(d) allows a court discretion to divide marital property in what it considers "just proportions," taking into account all listed factors as well any other factors deemed relevant in a particular case. (*In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 411 N.E.2d 238.) Again, a trial court has broad discretion in the valuation and subsequent distribution of marital assets, and such discretion will not be disturbed absent clear abuse. (*In re Marriage of Rapacz* (1985), 135 Ill. App. 3d 1045, 482 N.E.2d 441.) The touchstone of proper and just apportionment is whether it is equitable in nature (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748), with each case to rest on its own facts (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336). The requirement that a division be just and equitable does not mean that the division must be equal (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d

866), although an award which splits the marital property in equal halves will not be overturned on that basis alone.

Respondent believes equity here demands he be awarded a greater proportion of the marital assets, arguing the court completely failed to take into consideration petitioner's "substantial income producing nonmarital assets." The award of the $100,000 to the petitioner as nonmarital property, respondent asserts, unfairly tips the relevant economic scales in her favor.

■■■ The trial court's findings in this regard are not an abuse of discretion. The record indicates the court was concerned with the nonmarital property it set aside. There are also indications in the testimony and record that respondent had an expectation interest in a substantial inheritance from his father at some future point. Although an heir apparent has no legal or equitable right in the estate of the person whose heir he is during that person's lifetime (*People v. Emery* (1924), 314 Ill. 220, 225, 145 N.E. 349, 351), there is generally no error where a court considers a future or anticipated inheritance when distributing property. (See *In re Marriage of Smith* (1981), 100 Ill. App. 3d 1126, 427 N.E.2d 1262.) The Act itself requires a court to consider nonmarital property, even where such property will not be received until some future point, in assessing "the reasonable opportunity of each spouse for future acquisition of capital assets and income." (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(10); see also *Smith*, 100 Ill. App. 3d 1126, 427 N.E.2d 1262.) It is a fair inference from the record the court implicitly recognized respondent's anticipated future inheritance under the circumstances of this case.

Respondent next speaks of a disparity in present income, asserting the court did not consider all relevant factors under section 503(d), including the "relevant economic circumstances of each" (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(4)), their relative "age, health, station, occupation, amount and sources of income" (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(7)), and "the reasonable opportunity of each spouse for future acquisition of capital assets and income" (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(10)). As both parties are retired, respondent deems it significant each will be living out the remainder of their lives on more or less a fixed income. However, respondent claims the trial court's award will allow Helen "to live the rest of her life in a substantially better style than Curtis." Respondent claims that, in considering Helen's monthly social security and pension benefits, the income from the two marital certificates of deposit awarded her, and the income to be earned from the nonmarital $100,000 certificate, she has the potential to earn $10,000 a year more than he.

While a trial court must consider all relevant factors before exercising its discretion in distributing marital property, it need not make specific findings as to each of the factors set forth in section 503(d). (*In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1, 489 N.E.2d 1120.) Respondent overlooks petitioner's past contributions to the marital partnership (see Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(1)), which were specifically commented upon in the court's July 7, 1987, opinion. Testimony revealed petitioner contributed to the marriage more than $14,000 in profits from the operation of her family farm prior to its sale. The down payment on the marital home included the sum of $18,000 petitioner realized from the sale of her mother's house. While $100,000 was placed in the separate Helen Benz trust, any interest income from it was used in the marital partnership. Two $5,000 gifts were made to each of respondent's daughters directly from the petitioner's family farm sale proceeds. An automobile later designated marital property and set off as such was purchased through the use of Helen's $10,000 certificate. Petitioner also made domestic contributions to the marital household, including helping care for respondent's father, presumably also utilizing her skills as a registered nurse to some extent.

Respondent on the other hand was awarded the marital home (see Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(4)) subject to the mortgage, with an equity value of at least $45,000. He was further awarded his full pension at $624.72 per month, which will drop to $579.72 when he reaches age 65. Petitioner's pension from Brokaw Hospital, in contrast, is set at $98 per month. An affidavit in the record indicates petitioner's monthly income, excluding interest earned from the certificates of deposit, is $467 per month, representing the pension payments plus social security benefits. Her monthly living expenses, though, are totalled at $962.24. There is some indication Curtis' yearly income will be $17,761.45, while his anticipated expenses are denoted at $13,500 per year.

We fail to see any abuse of discretion by the trial court in this or any other contested area on appeal. We shall not substitute our judgment for that of the trial court. The judgment of the circuit court of McLean County is therefore affirmed.

Affirmed.

GREEN, P.J., and SPITZ, J., concur.