**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200032

Order filed April 8, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| CATHERINE WEST, | ) | Knox County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0032 |
| | ) | Circuit Nos. 18-D-128 |
| and | ) | 19-OP-135 |
| | ) | |
| DONALD WEST, | ) | The Honorable |
| | ) | Scott Shipplett, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Trial court did not err in classifying house, camper and boat as marital property where husband failed to present sufficient evidence to establish they were nonmarital; and (2) trial court did not abuse its discretion in ordering husband to pay monthly maintenance to wife where husband's net income was more than three times wife's monthly disability income.

¶ 2    Petitioner Catherine West filed a petition for dissolution of marriage against respondent

Donald West. Following a trial, the trial court entered an order (1) classifying a house, camper and

1

tractor as marital property subject to division, and (2) ordering Donald to pay monthly maintenance to Catherine of $864.83. Donald appeals both rulings. We affirm.

¶ 3                                              BACKGROUND

¶ 4        Catherine and Donald West were married on May 30, 1999. Throughout their marriage, they lived in a home that Donald purchased in 1997. The home was titled in Donald's name only until March 2018, when he transferred the property into joint tenancy with Catherine. In August 2018, Catherine filed a petition for dissolution of marriage.

¶ 5        A trial was held in May 2019. At the time of trial, Donald was 62 years old. He retired from the State of Illinois as a prison guard in 2007. He was diagnosed with Stage IV cancer in 2017. At the time of trial, Catherine was 60 years old. She is disabled.

¶ 6        Before Donald and Catherine's marriage, Catherine moved into Donald's house. Shortly after that, Catherine began contributing to the "house account," which was used to pay the mortgage and utilities. Catherine testified that she began contributing to the household bills, including the mortgage, shortly after she moved into the house and continued to do so throughout her marriage to Donald.

¶ 7        Donald testified that Catherine began telling him she wanted him to transfer the house into joint tenancy with her in 2008. She became "a little bit more serious" about that request in 2017 after his cancer diagnosis. According to Donald, in February or March 2018, Catherine gave him "an ultimatum." She told him that if he "didn't have her name on the deed by the time her granddaughter was born on April 5th, then she was leaving." Sometime after that, Catherine left and went to her father's house. Donald convinced Catherine to return home and had a deed prepared placing the house in joint tenancy with her. He said he changed the deed only because he was in poor health and Catherine threatened to leave him.

2

¶ 8 Catherine testified that when Donald received his cancer diagnosis in 2017, she thought she and Donald needed "to get all our ducks in a row." She wanted her name added to the deed to the house "so that I know my home is protected." Donald refused to do so. Catherine denied giving Donald an "ultimatum." She admitted she went to her father's house for less than one hour after a disagreement with Donald about ownership of the house, explaining that she was "stressed out." Catherine denied that she ever threatened to leave Donald if he did not put her name on the deed to the house.

¶ 9 Donald testified that he purchased a Jayco camper in 2007 after trading in a camper his parents gave him in late 2006 or early 2007. Donald initially testified that his parents gave the camper "to me," but later in his testimony said that his parents gave the camper to "us," referring to him and Catherine. The titles to the camper gifted by Donald's parents and the Jayco camper were in Donald's name alone. Catherine testified that Donald's parents gave the camper to "us," referring to Donald and her. Donald never told Catherine the camper did not belong to her.

¶ 10 Prior to marriage, Donald owned a tractor, which he sold in 2004. Donald used the money he obtained from that sale, as well as money he obtained from an equity line of credit on his home, to purchase an IH 884 tractor in 2004. Donald did not testify as to the amount he paid for the IH 884 tractor or the amount he received for selling his old tractor. Donald and Catherine both contributed to paying the equity line of credit on the home.

¶ 11 According to documents provided to the court, Donald had monthly net income of $3725.34 from his pension, and Catherine received monthly social security disability payments of $1001.70. According to Donald's financial affidavit, he had monthly medical expenses of $630.93 in 2017. He also provided the court with a handwritten list of his 2018 medical expenses, which averaged $792.23 a month. Donald had an outstanding medical bill from University of Iowa

3

Hospitals & Clinics totaling $4,020.53 for medical services provided to him from January to September 2019. Donald received AFLAC payments totaling $5,853.25 from February 2017 to March 2018. At the time of trial, Donald described his medical condition as "stable."

¶ 12    Following the trial, the court issued an opinion letter finding that the house, tractor and camper were marital property. With respect to the house, the court stated that "the transfer of the house into joint tenancy was done as a reflection of, and in acknowledgement of, a long history of matrimony and for purposes of estate planning." In examining the statutory maintenance factors, the trial court found that "Husband clearly has more income each month than the wife, and Wife clearly needs maintenance to assist in paying expenses going forward." When considering "[a]ll sources of public and private income," the court noted that "Husband also has the ability to draw social security and has elected to hold off on that at this time." The court awarded Catherine monthly maintenance of $864.83. An order was entered incorporating the court's rulings.

¶ 13                                ANALYSIS

¶ 14                        I. Classification of Property

¶ 15    Donald appeals the trial court's classification of certain property as marital. He contends that his home, tractor and camper were nonmarital property.

¶ 16    The Illinois Marriage and Dissolution of Marriage Act (Act) creates a rebuttable presumption that all property acquired during marriage is marital property regardless of how title to the property is held. *In re Marriage of Hegge*, 285 Ill. App. 3d 138, 141 (1996); 750 ILCS 5/503(b)(1) (West 2020). The presumption can only be overcome by showing with clear and convincing evidence that the property falls within one of the statutory exceptions listed in subsection (a), such as "(1) property acquired by gift, legacy or descent, or property acquired in exchange for such property;" or "(2) property acquired in exchange for property acquired before

4

the marriage." *Hegge*, 285 Ill. App. 3d at 141; 750 ILCS 5/503(a)(1)-(2) (West 2020). The party claiming the property is nonmarital has the burden of proof. *Hegge*, 285 Ill. App. 3d at 141. All doubts as to the nature of the property are resolved in favor of finding that the property is marital. *Id*.

¶ 17 To establish property is nonmarital under section 503(a)(2) of the Act, a spouse must trace the entire purchase price to a nonmarital source. See *Hegge*, 285 Ill. App. 3d at 143. When marital assets are comingled with nonmarital assets to acquire new property resulting in a loss of identity of the contributing estates, the property is deemed marital. See *id*.; 750 ILCS 5/503(c)(1)(B) (West 2020). Notwithstanding any transmutation, the contributing estate shall be reimbursed from the estate receiving the contribution if the contribution is traceable. 750 ILCS 5/503(c)(2)(A) (West 2020). "No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence." *Id.*

¶ 18 In determining whether property is marital or nonmarital, the trial court as the trier of fact is best able to observe the demeanor of the witnesses as they testified. *In re Marriage of Benz*, 165 Ill. App. 3d 273, 280 (1988). It is the trial court's function to resolve conflicting testimony by assessing the credibility of witnesses and the weight to be accorded their testimony. *Id*.

¶ 19 A trial court's classification of property as marital or nonmarital will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. "A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *Id*.

¶ 20                                                      A. House

¶ 21     "[N]onmarital property may be presumptively transmuted to marital property." *In re Marriage of Olson*, 96 Ill. 2d 432, 438-39 (1983). When "a spouse owning separate non-marital property performs the affirmative act of *** transferring title into a form of joint ownership *** such act creates the 'rebuttable presumption' of that party's intention to change the character of the property to marital." *In re Marriage of Wojcicki,* 109 Ill. App. 3d 569, 572-73 (1982). The rebuttable presumption of transmutation may be overcome by clear and convincing evidence that no gift to the marital estate was intended. *Zito v. Zito*, 196 Ill. App. 3d 1031, 1034 (1990). To successfully rebut this presumption, "more evidence than [a spouse's] own statement of intent" is required. See *In re Marriage of Cullman*, 185 Ill. App. 3d 1029, 1035 (1989).

¶ 22     Here, the trial court found the marital home was transmuted to marital property when Donald placed it in joint tenancy with Catherine. Because Donald transferred the property into joint tenancy, he had to prove by clear and convincing evidence that he did not intend to gift the property to the marital estate. See *Wojcicki* 109 Ill. App. 3d at 572-73; *Zito*, 196 Ill. App. 3d at 1034. While Donald testified that he transferred the property into joint tenancy because Catherine threatened she would leave if he refused to do so, that testimony alone was insufficient to prove by clear and convincing evidence that the property had not been transmuted. See *Cullman*, 185 Ill. App. 3d at 1035.

¶ 23     Furthermore, Catherine refuted Donald's testimony, denying that she threatened to leave Donald if he did not place the home in joint tenancy. The trial court, as the trier of fact was in the best position to resolve conflicting testimony. See *Benz*, 165 Ill. App. 3d at 280. Here, the trial court found Catherine's testimony more credible, stating that "the transfer of the house into joint tenancy was done as a reflection of, and in acknowledgement of, a long history of matrimony and for purposes of estate planning." Based on the evidence presented, the trial court's finding that

6

Donald failed to establish by clear and convincing evidence that no gift to the marital estate was intended when he transferred ownership of the home into joint tenancy with Catherine was not against the manifest weight of the evidence.

¶ 24                                                    B. Camper

¶ 25        There is a presumption that a transfer from a parent to a child is presumed to be a gift to the child alone and not the marital estate. See *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). However, that presumption is neutralized by the conflicting presumption that all property acquired after marriage is marital property; thus, the trial court is free to determine the issue of whether the asset in question is marital or nonmarital property based on the facts without resort to either presumption. *Id.* at 187.

¶ 26        In this case, the trial court found the Jayco camper was marital property. The evidence at trial showed that Donald obtained that camper after trading in a camper his parents gifted him. There was conflicting testimony at trial about who Donald's parents gifted the original camper to. Donald initially testified that his parents gave the camper only to him but later stated they gave it to "us," referring to him and Catherine. Catherine testified that Donald's parents gave the camper to both her and Donald.

¶ 27        The party claiming that the property is nonmarital has the burden of proof. See *Hegge*, 285 Ill. App. 3d at 141. All doubts as to the nature of the property are resolved in favor of finding that the property is marital. *Id.* Based on the testimony presented at trial, the trial court's finding that Donald failed to establish that the camper was a gift to him alone was not against the manifest weight of the evidence.

¶ 28                                                    C. Tractor

7

¶ 29    When nonmarital farm equipment is traded in for new equipment and marital funds are used to pay the difference in value, the marital and nonmarital property is transmuted into newly acquired marital property. See *In re Marriage of Patrick,* 233 Ill. App. 3d 561, 569-70 (1992). The nonmarital estate is subject to reimbursement if the owner of the nonmarital property can show by clear and convincing evidence the amount he received for trading in his nonmarital equipment. *Id.* at 570; 750 ILCS 5/503(C)(2)(A) (West 2020). If the nonmarital property owner fails to present evidence concerning the amount he received for trading in his nonmarital property, it is presumed that the nonmarital property was intended to be a gift to the marital estate, and the new property is transmuted to marital property with no reimbursement owed to the nonmarital estate. See *Patrick,* 233 Ill. App. 3d at 570.

¶ 30    Here, the trial court found the IH 884 tractor was marital property. At trial, Donald testified that he acquired the tractor by using funds he obtained from trading in an old tractor he possessed prior to marriage and funds he obtained by taking out a loan from a home equity line of credit. However, Donald did not present any documentation or testimony establishing the amount he received for selling his old tractor. Because the IH 884 tractor was paid for, in part, by marital funds and Donald presented no evidence regarding the amount of nonmarital funds used to purchase the tractor, the trial court properly found the new tractor was marital property. See *id.*

¶ 31                                    II. Maintenance

¶ 32    Donald also argues that the trial court erred in ordering him to pay monthly maintenance to Catherine.

¶ 33    "The trial court has broad discretion in determining the propriety, amount and duration of a maintenance award, and its judgment will not be disturbed absent an abuse of discretion." *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 707 (2006). "Under the abuse of discretion standard,

the question is not whether this court might have decided the issue differently, but whether any reasonable person could have taken the position adopted by the trial court." *Id*. at 708.

¶ 34 Maintenance is appropriate where one party is unable to support himself or herself in some approximation to the standard of living enjoyed during the marriage and the other party is able to pay. *In re Marriage of Roberts*, 2015 IL App (3d) 140263, ¶ 22. A trial court determines an award of maintenance based on the evidence presented at trial. *Id.*

¶ 35 In determining whether maintenance is appropriate, the trial court shall consider the following factors:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

9

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

¶ 36    In determining a maintenance award, the trial court is not limited to the factors listed in section 504(a) of the Act and has wide latitude in considering what factors should be used in determining reasonable needs. *In re Marriage of Murphy,* 359 Ill. App. 3d 289, 304 (2005). No one factor is determinative of the propriety of the maintenance award once the court determines that maintenance is appropriate. *Id.* A trial court may consider social security benefits in determining a maintenance award. *Roberts*, 2015 IL App (3d) 140263, ¶ 21; *In re Marriage of Dea,* 2013 IL App (1st) 122213, ¶ 19; *In re Marriage of Rogers,* 352 Ill. App. 3d 896, 899 (2004).

¶ 37    Here, the trial court examined all the statutory factors and concluded that that "Husband clearly has more income each month than the wife, and Wife clearly needs maintenance to assist

10

in paying expenses going forward." This finding was not an abuse of discretion, nor was the amount of maintenance the trial court awarded. The evidence at trial established that Donald received $3725.34 in monthly income from his pension, and Catherine received monthly social security disability payments of $1001.70. Even with the monthly maintenance payments ordered by the court, Donald will have more than $1,000 in monthly income than Catherine.

¶ 38     Nevertheless, Donald contends that the trial court erred in its award of maintenance by (1) failing to consider his "excessive" medical expenses, and (2) mentioning that he may be entitled to social security payments in the future. We disagree.

¶ 39     While the evidence showed that Donald had medical expenses averaging more than $600 per month in 2017 and more than $700 per month in 2018, the only evidence he presented at trial showed that he incurred medical expenses of $4,020.53 for the first nine months of 2019, which averages to $446.72 per month. Thus, Donald's medical expenses were declining at the time of trial. That decrease is consistent with Donald's testimony that his medical condition had become "stable." Additionally, evidence at trial showed that Donald was reimbursed by AFLAC for a large portion of his out-of-pocket medical expenses in 2017 and 2018. Because the amount of unreimbursed medical expenses Donald was required to pay was unclear at the time of trial, the trial court did not abuse its discretion in failing to consider Donald's medical expenses in calculating the maintenance award.

¶ 40     Additionally, the trial court did not abuse its discretion in merely mentioning that Donald "has the ability to draw social security and has elected to hold off on that at this time" in considering the relevant section 504(a) factors. Section 504(a)(10) of the Act requires courts to consider "all sources of public and private income including, without limitation, disability and retirement income." The trial court did just that in mentioning that Donald may be able to receive

11

social security payments in the future. However, the trial court did nothing more than mention that possibility. It did not speculate about the amount of social security payments to which Donald was entitled or suggest when he would receive them. The court also did not state that its maintenance award was in any way contingent upon Donald's receipt of social security in the future. The trial court's mere mention that Donald could be entitled to social security payments in the future, without more, did not render the trial court's maintenance award an abuse of discretion.

¶ 41                                          CONCLUSION

¶ 42        For the foregoing reasons, the judgment of the circuit court of Knox County is affirmed.

¶ 43        Affirmed.