*In re* MARRIAGE OF VIRGINIA L. BLAZIS, Petitioner-Appellee, and ROBERT A. BLAZIS, Respondent-Appellant.

Fourth District   No. 4—93—0731

Argued February 22, 1994.—Opinion filed June 9, 1994.

Patrick J. O'Hara (argued), of Petersburg, for appellant.

Howard E. Feldman and Frederic Benson (argued), both of Feldman & Wasser, of Springfield, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In November 1992, the trial court entered a judgment dissolving the 25-year marriage between Virginia Blazis, petitioner, and Robert Blazis, respondent. In April 1993, after receiving evidence and memoranda from both parties, the court entered an order distributing the marital property. In this order, the court also required respondent to pay a portion of petitioner's attorney fees. The court subsequently denied respondent's motion for reconsideration.

Respondent appeals, arguing that the trial court (1) abused its discretion in dividing his pension between the parties, (2) erred by finding that monies he received from his mother during the marriage were not a marital debt, and (3) abused its discretion by requiring him to pay a portion of petitioner's attorney fees without conducting an evidentiary hearing on the matter.

We affirm.

## I. BACKGROUND

Petitioner (43 years old at the time of these proceedings) and respondent (44 years old) married in June 1967. They had two children during their marriage, who were both adults at the time of these proceedings. In January 1992, petitioner filed a petition for dissolution of the marriage, which the trial court granted in November 1992. The court held hearings in October and December 1992 concerning the division of the marital property.

At the time of these proceedings, respondent was employed by the Illinois State Board of Education (ISBE) as the assistant superintendent of administrative services. He had worked at ISBE for more than 20 years, and his current salary was over $76,000. Because he worked for the ISBE, he was mandatorily covered under the Illinois Teachers' Retirement System (ITRS) in lieu of participation in the social security system, and thus paid approximately 8% of each paycheck into ITRS. See Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, par. 16—152.

During the hearings, Dr. Thomas Langford testified on behalf of petitioner as an expert concerning the estimated present value of respondent's ITRS pension. Langford determined that value by using generally accepted economic techniques and principles, as well as a

"formula" method and an "actuarial" method. He used these methods because ITRS was statutorily required to calculate respondent's actual pension benefits under both methods. He explained that the amount of the actual pension benefits (when a covered employee actually retires) is determined by the greater of the benefit amount computed under the formula method or under the actuarial method. See Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, par. 16—133(a).

In computing the value of respondent's pension benefit under both methods, Langford relied upon the following information: (1) respondent's current age; (2) an assumed retirement when respondent reached 60 years of age; (3) the Illinois mortality tables from the National Center for Health Statistics; and (4) an interest rate based upon the average effective yields for U.S. Treasury Bills as listed in the Wall Street Journal. Langford used this interest rate to calculate the present value (in 1992 dollars) of pension benefits respondent should receive after he retires. Langford also explained that he assumed respondent's retirement at 60 years of age because retirement at an earlier age could incur a penalty, resulting in a reduction in the amount of pension benefits. See Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, par. 16—133(a)(B).

Langford noted that the formula method is based upon a mathematical formula set forth in the statutory framework for ITRS. (See Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, par. 16—133(a)(B).) When employing this method, Langford relied upon the following additional information (not used by the actuarial method) to calculate respondent's estimated pension benefit: (1) respondent's years of credited service with ITRS at the time of the hearing; and (2) a final, averaged yearly salary based upon the last four years of respondent's employment prior to the hearing. Under this method, Langford determined that the marital portion of the present value of respondent's retirement benefits, as of the day before the October hearing, was $73,818.

Langford next testified about the results he calculated using the actuarial method. The actuarial method takes the balance of contributions an employee paid into ITRS, plus interest, and compares it to the value of an annuity that could be purchased in the private sector with that balance. Therefore, respondent's estimated pension benefit would equal the yearly payments from such an annuity. When using this method, Langford relied upon the following additional information (not used by the formula method) to calculate respondent's estimated pension benefit: (1) the total amount of contributions respondent made into ITRS, plus interest; and (2) an averaged interest rate available in the private sector on an annuity. Under this method, Langford determined that the marital portion of

the present value of respondent's retirement benefits, as of the day before the October hearing, was $118,664.

During cross-examination, Langford testified that the basic difference between the actuarial method and the formula method is the difference in the interest rates used to arrive at respondent's estimated pension benefit. Under the formula method, the statute assumes a certain rate of earnings in its mathematical formula; whereas, under the actuarial method, the interest rate structure is based upon the market rate of a private sector annuity. He acknowledged that the actuarial method is subject to more future assumptions than the formula method—mainly that an annuity could be purchased in the future at the same cost it could be purchased today. He also acknowledged that respondent would incur a risk that he could die prior to his retirement and not receive any payments from his pension, while petitioner would not share this risk if she received her portion of the pension up front.

Jay Buck, a certified public accountant, testified as an expert for respondent on the estimated present value of respondent's pension. Buck determined the present value of respondent's pension by using only the formula method. Under this method, Buck calculated that the marital portion of the present value (as of June 1, 1992) of respondent's pension was $75,325. Buck noted that his calculations differed from Langford's because (1) he assumed a different interest rate, and (2) he used life expectancy probabilities, instead of the likelihood of death probabilities used by Langford. Buck stated that while his calculations differed from Langford's, both were done according to acceptable accounting principles and practices.

Buck wrote respondent a letter explaining that he did not utilize the actuarial method because it is based upon "assumptions, including future post[-]marital growth of contributions." Buck testified that assumptions about interest rates and mortality rates are also included in the assumptions underlying the actuarial method. He noted that ITRS does not provide specific calculations for the actuarial method as it does for the formula method. On cross-examination, Buck stated that ITRS does allow for valuing an employee's pension under both the formula method and the actuarial method at the time the employee retires, and at retirement, future assumptions must be made in order to calculate the employee's pension benefit under the actuarial method. Buck indicated that these future assumptions are similar to those Langford made in his calculations under the actuarial method.

Isabelle Blazis (Mrs. Blazis), respondent's mother, testified regarding money she gave respondent during his marriage with

petitioner. In February 1985, she gave him a check for $10,000 after he had asked her for the loan, but she could not remember if he told her why he needed it. She testified that respondent filled out and signed a promissory note for the money when he received it, but she later stated that she could not remember if she had the promissory note forms back in 1985. Mrs. Blazis never requested or received any payments from respondent, intending instead to demand repayment "[w]hen she needed [the money]." She acknowledged that petitioner was not present when respondent signed the note, and she had never discussed the loan with petitioner.

When confronted with her responses at a deposition in September 1992, she acknowledged her previous statement that she was going to ask for the money when Mark, the parties' son, graduated from college. Her deposition also indicated that the money was for Mark's college expenses. When reminded that Mark was only in high school in 1985, she testified "[w]ell, whatever. I don't know. I don't know when he was in college." After further questioning, Mrs. Blazis stated that respondent had not asked her for the money in order to help with Mark's college expenses.

Mrs. Blazis next testified that she gave respondent a check for $16,720 in May 1991 as a loan for purchasing a car, but she did not know if he used the money for that purpose. Again, however, Mrs. Blazis was confronted with her inconsistent deposition testimony that she could not remember why respondent asked for the loan. When presented with a promissory note for $16,720 dated May 13, 1991, and asked if respondent signed it on that day, she testified "[y]eah. I can't remember, but I guess so. It says so." She also could not remember if she gave respondent the promissory note to fill out and sign or if respondent gave it to her. She testified that she has not yet demanded payment on the loan, but that she intended to do so after Mark graduated from college. She again acknowledged that petitioner was not present when respondent signed this note and that she never discussed it with petitioner.

Mrs. Blazis further testified that she made three loans to respondent of $1,000 on December 25, 1989, December 24, 1990, and December 20, 1991. Respondent also signed a promissory note for each of these transfers. She testified that none of these transfers were Christmas presents; they were loans she made to respondent upon his request. She did not know why he wanted any of these loans or how he used the money. She testified that she had not yet demanded repayment of any of these loans, but—again—that she might ask "[w]hen I need it or sometime after [Mark graduates from] college." Regarding each of these transfers, she again acknowledged

that petitioner was not present when respondent signed these notes and that she had never discussed these loans with petitioner.

Respondent also testified about the money he received from his mother. He stated that for each check, he took a promissory note from a drawer in his mother's residence, filled out and signed the note, and then gave it to his mother. He did not discuss the three $1,000 loans with petitioner, and he did not think that she was aware, at that time, that he had received those checks. He testified that he told petitioner after receiving the $16,720 check that it was a loan they had to repay, but he did not show her the promissory note. He remembered that petitioner was unresponsive when he told her about the loan. He stated that he deposited the check in his savings account and used the money to buy a car, to go on a cruise with petitioner, and to pay other debts.

Regarding the $10,000 check that respondent received from his mother in February 1985, he testified that he told petitioner they borrowed this money from his parents in order to purchase a new car. He could not recall if he showed petitioner a copy of the promissory note, but he stated that she was aware they had to repay the money with 6% interest. He used this money to buy a minivan. He testified that the promissory note for the 1985 loan was actually a replacement note he made out in May 1991. He noted that his marriage at this time was experiencing difficulties, but they were "not extreme." He stated that the other notes were completed on the dates set forth on the face of each note.

Respondent further testified that his understanding with his mother regarding repayment of the loans was that respondent and petitioner would pay her back when they could do so. He could not remember if he had ever discussed this with petitioner; however, he thought that they probably had talked about it, and that she had concurred with it; however, he could not recall exactly what was said. He also testified that he borrowed another $2,750 from his mother in August 1992. This loan was also evidenced by a promissory note and was used to pay the real estate taxes on the marital home.

Petitioner testified that she did not know about any of the three $1,000 loans and that she did not see any of the related promissory notes until after her separation from respondent. She also stated that she could not find any records that any of those checks was deposited in their joint checking or savings accounts. Regarding the $16,720 check, she recalled respondent telling her that "Mom gave us $16,720." He never indicated that it was a loan or that they would have to repay the money. She also remembered that respondent told her that the reason the check was made out for an odd amount was

because his mother gave the same amount to respondent's brother for a down payment on a house.

Regarding the $10,000 they received in February 1985, petitioner testified that after they had purchased a minivan by borrowing money from a bank, they drove it to respondent's parents' house. She remembered respondent having a conversation with his father, and respondent later telling her that "Dad gave us the money" to pay off the bank loan. She testified that respondent never told her that this was a loan from his parents and that she never saw a promissory note for such a loan. On cross-examination, she testified that she and respondent thanked respondent's parents for the $10,000, but that she never did thank respondent's mother for the $16,720.

In April 1993, after reviewing the evidence and receiving memoranda from both parties, the trial court divided the marital property. In doing so, the court found that the present value of respondent's pension should be determined under the actuarial method. Further, the court essentially found that the transfers of money from respondent's mother were not loans and thus not considered in dividing the marital property. The court also granted petitioner's request to require respondent to pay a portion of her attorney fees after finding these fees reasonable as set forth in her attorney's affidavit.

## II. ANALYSIS

### A. *Valuation of Pension Rights*

Respondent first argues that the trial court abused its discretion when it valued his ITRS pension rights. Pension rights are a marital asset the court should consider when distributing the marital property between the parties. (See *In re Marriage of Hackett* (1986), 113 Ill. 2d 286, 291-92, 497 N.E.2d 1152, 1154; *In re Marriage of Davis* (1991), 215 Ill. App. 3d 763, 773, 576 N.E.2d 44, 51.) Generally, the distribution of marital assets, including pension plans, lies within the sound discretion of the trial court, and this court will not disturb the trial court's decision absent an abuse of that discretion. (*In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 979, 605 N.E.2d 670, 681; *In re Marriage of Korper* (1985), 131 Ill. App. 3d 753, 757-58, 475 N.E.2d 1333, 1336.) Respondent does not contest that his pension rights are marital property and that petitioner is entitled to an equitable portion of these rights. Nor does he contest the percentage of the marital estate the court awarded to petitioner. The only trial court ruling respondent contests regarding his pension is that the court erred when it valued his pension rights.

The trial court granted petitioner 60% of the marital assets, which included respondent's pension benefits, because of the disparity in earning potential between the parties. Concerning respondent's pension, the court "adopted the actuarial method of calculation presented by [petitioner's] expert witness, and \*\*\* concluded that the present value of the marital portion of [respondent's] pension is $118,664.43." Respondent claims that the court should have valued his pension under the formula method, which his expert calculated to be $75,325. Both of these methods are discussed in section 16—133(a) of the Illinois Pension Code (Pension Code) (Ill. Rev. Stat. 1991, ch. 108¹/₂, par. 16—133(a)).

■ In general, two approaches exist for distributing the marital portion of a spouse's pension rights: (1) the "total-offset" approach; and (2) the "reserved-jurisdiction" approach. (See *In re Marriage of Wiley* (1990), 199 Ill. App. 3d 169, 177, 556 N.E.2d 809, 814.) Under the total-offset approach, at the conclusion of the dissolution proceedings, the trial court awards the entire pension rights to the employee spouse and, based upon a determination of the present value of the employee spouse's estimated pension benefits, awards marital property to the nonemployee spouse in an amount comparable to the present value of those pension benefits in order to "offset" the value of the pension. Under the reserved-jurisdiction approach, on the other hand, the trial court orders the employee spouse to pay the nonemployee spouse his or her allocated marital share of the pension benefits when the funds are actually paid to the employee spouse upon and during that spouse's retirement, while the court retains jurisdiction to enforce its order. *Wiley*, 199 Ill. App. 3d at 177, 556 N.E.2d at 814.

The court cannot always dispose of pension rights under one specific approach because of the differences in dissolution proceedings between the parties involved, their marital assets, pension types, duration of their marriage, and other related circumstances. (*Wiley*, 199 Ill. App. 3d at 178, 556 N.E.2d at 814-15.) Therefore, the decision as to which method the trial court should use lies within the court's discretion, and this court will not overturn its decision absent an abuse of its discretion. *In re Marriage of Mantei* (1991), 222 Ill. App. 3d 933, 937, 583 N.E.2d 1192, 1195.

In this case, the trial court used the total-offset approach by awarding respondent the total rights to his ITRS pension and awarding petitioner marital assets in an amount that offset the assigned present value of respondent's pension rights. Respondent does not explicitly argue that the trial court abused its discretion by using the total-offset approach. However, he asserts that if the trial

court uses the total-offset approach, it must use the formula method, not the actuarial method, under section 16—133(a) of the Pension Code for determining the estimated amount of his yearly pension benefits.

Regarding the evaluation of his pension benefits, respondent argues that the trial court should have used the formula method because this method "requires less future assumptions and speculation." He points out that the factors needed under the formula method are known when the calculations are made because they are set forth in section 16—133(a) of the Pension Code. Thus, he claims that unlike the actuarial method, which requires assumptions based in part upon future events, the formula method does not rely upon future assumptions and therefore is more reliable than the actuarial method.

Petitioner argues that section 16—133(a) of the Pension Code requires use of the actuarial method when it produces a larger amount than calculated under the formula method. Petitioner asserts that section 16—133(a) of the Pension Code should be construed with section 503 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (Ill. Rev. Stat. 1991, ch. 40, par. 503) to require use of section 16—133(a) of the Pension Code to value pension rights in ITRS when these rights are being divided in a dissolution proceeding. Alternatively, petitioner argues that the trial court's decision to use the actuarial method was not a clear abuse of its discretion for disposing of marital assets.

Respondent counters petitioner's statutory argument by asserting that section 16—133(a) of the Pension Code was not intended to address valuation of pension rights during dissolution proceedings. He again claims that the speculative nature of the actuarial method makes it inappropriate for determining the value of his pension rights, and further contends that the speculative nature of the actuarial method is "compounded" when, as here, it is used in conjunction with the total-offset approach for distributing the marital portion of the pension because both are based upon future assumptions. He notes that while no assumptions are necessary under the reserved-jurisdiction approach (because both the employee spouse and the nonemployee spouse receive the pension benefits at the same time, namely, when the actual distribution of the benefits is made), use of the total-offset approach assumes that the employee spouse will live to enjoy the benefits of his pension after retirement.

We note that the significant difference between the formula method and the actuarial method—and the real issue presented here—is how to estimate the amount of yearly pension benefits that

respondent will receive when he retires. Under either method, once respondent's estimated yearly pension benefits are determined, then "actuarial calculations" are used to establish the total present value (in 1992 dollars, the time of these proceedings) of respondent's pension rights. These "actuarial calculations" are based upon mortality tables and assumed interest rates. Thereafter, as done in this case, the trial court uses this total present value of respondent's pension rights for determining petitioner's share of the pension rights and then distributing the marital property accordingly.

Section 16—133(a) of the Pension Code states the following regarding the calculations of pension benefits under ITRS:

"Retirement annuity; amount. (a) The amount of the retirement annuity shall be the larger of the amounts determined under paragraphs (A) and (B) below:

(A) An amount consisting of the sum of the following:

(1) An amount that can be provided on an actuarially equivalent basis by the member's accumulated contributions at the time of retirement; and

(2) The sum of (i) the amount that can be provided on an actuarially equivalent basis by the member's accumulated contributions representing service prior to July 1, 1947, and (ii) the amount that can be provided on an actuarially equivalent basis by the amount obtained by multiplying 1.4 times the member's accumulated contributions covering service subsequent to June 30, 1947. ***
***

(B) An amount consisting of the greater of the following:

(1) 1.67% of final average salary for each of the first 10 years of creditable service, 1.90% of final average salary for each year in excess of 10 but not exceeding 20, 2.10% of final average salary for each year in excess of 20 but not exceeding 30, and 2.30% of final average salary for each year in excess of 30; and

(2) $1^1/2$% of final average salary for each year of creditable service plus the sum $7.50 for each of the first 20 years of creditable service." (Ill. Rev. Stat. 1991, ch. $108^1/2$, par. 16—133(a).)

The parties agree that section 16—133(a)(A) of the Pension Code sets forth the actuarial method, while section 16—133(a)(B) of the Pension Code sets forth the formula method.

Thus, under the Pension Code, two methods exist for determining the amount of a retiree's pension benefit. As noted by both petitioner's and respondent's experts, the formula method set forth in section 16—133(a)(B) uses two factors to calculate the amount of a retiree's

pension benefit: (1) years of creditable service; and (2) a final average salary. At the time of these proceedings, both of these factors were readily determined for respondent. On the other hand, the actuarial method as discussed in section 16—133(a)(A) determines the retiree's pension benefit from the "actuarially equivalent" of the employee's accumulated contributions into ITRS. As noted by petitioner's expert, the actuarial method uses three different factors to calculate the amount of a retiree's pension benefit: (1) total amount of pension contributions; (2) an estimated interest rate at which this total amount of contributions will grow during the years prior to the retirement age; and (3) an annuity interest rate found in the private sector. Accordingly, at the time of these proceedings, the amount of respondent's contributions was determinable, but the interest rates had to be assumed.

Respondent essentially argues that the trial court is not required by section 16—133(a) of the Pension Code to use the actuarial method when distributing property under section 503 of the Marriage Act. On the other hand, petitioner claims that these two sections should be read together as requiring the court to follow section 16—133(a) of the Pension Code and, consequently, requiring use of the method which produces the higher amount of pension benefits. We agree with respondent. We do not find anything in section 503 of the Marriage Act which requires strict use of any section of the Pension Code when valuing and distributing pension benefits during dissolution proceedings. Moreover, we note that the Pension Code, and specifically section 16—133, does not address how to value and distribute pension benefits during dissolution proceedings.

Respondent further argues that the speculative nature of the actuarial method makes it inappropriate for valuing an ITRS pension in any situation. He claims that because the actuarial method relies upon assumptions which must be made outside the statutory framework, the formula method as set forth in section 16—133(a) of the Pension Code should be the only method used for valuing ITRS pensions. He concludes that the trial court should have used the formula method *as a matter of law* because it does not include "speculation and assumptions" and "avoid[s] the [resulting] inequity of the actuarial method." On this issue, we disagree with respondent.

Although section 16—133(a) of the Pension Code is not dispositive, we see no reason why it should be completely ignored. The actuarial method is not an invalid method for calculating a retiree's pension benefit. We note that the statutory framework under section 16—133(a) of the Pension Code does provide for use of this method. Also, respondent's expert did not state that the actuarial method

could not be used to calculate respondent's estimated pension benefit; rather, he opined that its use would be inappropriate in this case. Additionally, the actuarial method is based upon generally accepted accounting and economic techniques and principles.

Respondent heavily relies on his argument that the actuarial method is "more speculative" than the formula method because future assumptions must be made in order to use it. However, both methods rely upon future assumptions to some degree. As noted by respondent's expert, the General Assembly built the future assumptions about interest rates into the formula it set forth in section 16—133(a)(B) of the Pension Code, whereas future assumptions based upon current market conditions for interest rates must be made at the time a pension benefit is calculated when using the actuarial method.

■ Accordingly, instead of focusing on the different assumptions that each method relies upon, we conclude that the decision of which method is appropriate for valuing pension benefits under ITRS should be based upon the circumstances of each particular case. As with deciding which approach to follow when disposing of pension rights during dissolution, the circumstances of each case will affect the decision of which method provides the best valuation of pension benefits. (See *Wiley*, 199 Ill. App. 3d at 178, 556 N.E.2d at 814-15.) Like any decision regarding division of marital property, this decision is best left to the trial court's discretion because it is in a much better position than we are to review each situation. See *Tietz*, 238 Ill. App. 3d at 979, 605 N.E.2d at 681.

We also reject respondent's argument that the speculative nature of the actuarial method is "compounded" when used with the total-offset approach to dispose of his pension rights. We note that both the decision of which approach to use for disposing of pension rights and the decision of which method to use for valuing the pension rights should be made by the trial court based upon the relevant circumstances of each case. More importantly, both of these decisions will typically relate to one another. Thus, we do not believe that any specific combination of these approaches and method is improper; rather, we conclude that both decisions should be made based upon the relevant circumstances of each case.

Last, respondent argues that if the trial court had the option of using either the formula method or the actuarial method, it abused its discretion by choosing the actuarial method. He again asserts that because the actuarial method is based upon assumptions, it is more speculative than the formula method. As noted above, the decision of which method to use is a determination made by the trial court based upon the circumstances of each case.

868

In this case, the trial court received testimony from both parties' experts. Petitioner's expert explained how he determined respondent's estimated pension benefit under this method. He explained his assumptions for the interest rates and was extensively cross-examined by respondent. Also, respondent's expert testified that petitioner's expert properly calculated respondent's estimated pension benefit under the actuarial method. The trial court was in the best position to review and weigh this evidence. We find nothing from our review of the record which supports a conclusion that the trial court abused its discretion by choosing to distribute respondent's pension based upon petitioner's expert valuation under the actuarial method.

In conclusion, we hold that neither the actuarial nor the formula method for valuing pension rights under ITRS during a dissolution proceeding is presumptively better than the other or required as a matter of law. Furthermore, we hold that the trial court's use of the total-offset approach and the actuarial method was not an abuse of discretion in this case. Therefore, we conclude that the court did not abuse its discretion when it valued respondent's pension.

B. *Funds Received from Respondent's Mother*

Respondent next argues that the trial court erred by finding that he had dissipated marital assets by receiving several transfers of funds from his mother. Respondent asserts that these money transfers did not fall under the criteria set forth in *Szesny v. Szesny* (1990), 197 Ill. App. 3d 966, 557 N.E.2d 222, and thus could not constitute dissipation. Respondent claims that because these money transfers did not constitute dissipation of marital property and because the trial court did not specifically find that these transfers were gifts, the court erred in not considering these transfers as loans and marital debts which should have been assessed against the marital estate. We disagree.

Generally, as noted above, the distribution of marital assets lies within the discretion of the trial court, and this court will not disturb the trial court's decision absent an abuse of discretion. (*Tietz*, 238 Ill. App. 3d at 979, 605 N.E.2d at 681; *In re Marriage of Schmidt* (1993), 242 Ill. App. 3d 961, 966, 610 N.E.2d 673, 677.) When a court reviews the parties' marital assets and liabilities, transfers of money during the marriage from the parents of one of the parties are viewed with great skepticism because of the incentive for the parents and that spouse to conform their testimony at the dissolution proceeding so as to disadvantage the other spouse. (*Schmidt*, 242 Ill. App. 3d at 968-69, 610 N.E.2d at 678.) When the transferred funds no longer

exist, classifying the transfers as marital debt provides an advantage to the spouse whose parents made the transfer and would likely reduce the amount of marital assets awarded to the other spouse. (*Schmidt*, 242 Ill. App. 3d at 969, 610 N.E.2d at 678-79.) A court of review should not second-guess the trial court's factual findings on the validity of a debt when that finding is based upon the trial court's assessment of the credibility of witnesses and the weight it gives to their testimony (*In re Marriage of Jacks* (1990), 200 Ill. App. 3d 112, 119, 558 N.E.2d 106, 111; *In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 57, 523 N.E.2d 169, 175), unless the trial court's findings are against the manifest weight of the evidence (*Szesny*, 197 Ill. App. 3d at 973, 557 N.E.2d at 226).

■ In this case, the trial court made the following findings regarding these transfers of money between respondent's mother and respondent:

> "The Court seriously doubts whether the $32,470.00 figure which [respondent] claims to owe his mother is a debt which will ever have to be repaid, and pursuant to *Szesny v. Szesny*, 197 Ill. App. 3d 966, 145 Ill. Dec. 452, the Court finds that if that amount constitutes debts which have to be repaid, that the incurring of those debts constituted a dissipation of marital assets and that said debts are not to be repaid from marital funds. The Court therefore did not take the purported debts of [respondent] to his mother into account in arriving at the property distribution, but directs that [respondent] be solely responsible for the repayment of *any* such debt." (Emphasis added.)

The transfers at issue between Mrs. Blazis and respondent are the $10,000 transfer in February 1985, the $16,720 transfer in May 1991, the $2,750 transfer in August 1992, and the three $1,000 transfers in December 1989, 1990, and 1991. These six transfers total $32,470.

Although the trial court did not specifically express how it would characterize these money transfers, it did find that it "seriously doubt[ed]" whether these transfers were "a debt which will ever have to be repaid." The evidence presented strongly supports this finding. Respondent's mother gave conflicting testimony regarding if and when she expected repayment of these "loans" and could not recall why respondent "borrowed" any of this money. She could not remember the details surrounding the completion and signing of the promissory notes. Also, the promissory notes apparently were not completed until sometime after May 1991, at which time the parties were experiencing marital troubles. Furthermore, neither respondent or respondent's mother discussed the terms of the $10,000 and $16,720 "loans" or the conditions of their repayment with petitioner,

nor did they reveal to petitioner that the other four "loans" had been made. Thus, we conclude that the trial court's "serious doubt" constitutes a finding that these transfers were not a debt.

Ignoring this finding by the trial court, respondent focuses his argument on the trial court's additional statement that "if these transfers are debts," then they constitute dissipation of the marital assets and thus do not have to be repaid from marital funds. Respondent asserts that the trial court incorrectly found that these transfers amounted to dissipation. However, we need not address the issue of dissipation. The trial court's earlier finding that these transfers did not constitute a debt suffices by itself to justify the court's decision to not consider these transfers when dividing the parties' marital estate. Additionally, we note that the trial court's order that respondent "be solely responsible for repayment of any such debt" is a common practice that trial courts employ to address the parents who transferred the money, even when the court does not believe that a debt truly exists. See *Schmidt*, 242 Ill. App. 3d at 969, 610 N.E.2d at 679.

In conclusion, we hold that the trial court did not abuse its discretion by disregarding these money transfers between respondent's mother and respondent when it divided the parties' marital estate. (See *Schmidt*, 242 Ill. App. 3d at 969-70, 610 N.E.2d at 679; *In re Marriage of Jacks* (1990), 200 Ill. App. 3d 112, 119, 558 N.E.2d 106, 111.) The evidence supports the court's conclusion that these transfers were not loans.

## C. *Award of Attorney Fees*

Respondent last argues that the trial court abused its discretion when it ordered him to pay a portion of petitioner's attorney fees. He contends that he should have been granted a hearing on whether petitioner's attorney fees were reasonable before he could be ordered to pay a portion of those fees. He further claims that he made a proper request for such a hearing in his post-trial memorandum. Petitioner responds that respondent did nothing more in his post-trial memorandum than simply object to an award of attorney fees in general and therefore did not seek a hearing on the fees.

Whether one spouse's attorney fees should be paid by the other spouse and what proportion of these fees is to be paid are decisions which lie within the sound discretion of the trial court that this court will not overturn absent an abuse of that discretion. (*Schmidt*, 242 Ill. App. 3d at 971, 610 N.E.2d at 680.) If one of the parties requests a hearing on attorney fees, that party is entitled to have a hearing on the matter. (*In re Marriage of Feldman* (1990), 199 Ill. App. 3d 1002,

1007-08, 557 N.E.2d 1004, 1008.) However, if a party does not request a hearing before the trial court on attorney fees, then the right to that hearing is waived, and the court may enter an order based solely upon the submitted fee petitions and affidavits. *In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 231, 543 N.E.2d 119, 136.

■ In this case, both parties submitted memoranda to the trial court at its request after the two evidentiary hearings. In petitioner's memorandum, she requested that respondent pay her attorney fees because she lacked sufficient financial resources as compared to respondent. She also attached to her memorandum an affidavit from her attorney and a billing sheet detailing his fees. In respondent's memorandum, he stated the following regarding attorney fees:

> "Finally, it is anticipated that [petitioner] will ask the Court to require [respondent] to award her attorney's fees. However, no testimony of the amount of the attorney's fees was offered at trial nor has there been any showing of reasonableness. The submission of a mere affidavit after the fact is insufficient, since such is not subject to cross-examination nor a determination of reasonableness. In the absence of such, the Court does not have the power to award such attorney's fees. Moreover, there is ample marital property to be divided in this marital estate such that each party should be required to pay the respective attorney's fees."

The trial court made the following findings regarding the award of attorney fees:

> "The Court further believes that, in view of the disparity of the earning capacity of the respective parties, that [respondent] should be required to make a substantial contribution to the payment of attorney's fees incurred by [petitioner].

> * * *

> The Court further finds that the attorney's fees set forth in the affidavit of [petitioner's] counsel are reasonable and that the disparity in earning capacity requires [respondent] to pay a portion of [petitioner's] attorney[']s fees, the Court fixing said portion at $2,000."

Respondent claims that his memorandum clearly and sufficiently requested a hearing on petitioner's attorney fees. However, his memorandum to the trial court merely pointed out that no evidence concerning these attorney fees was presented during the evidentiary hearings, and then claims that an affidavit would be insufficient by itself to provide a basis upon which these fees could be awarded. We agree with petitioner that respondent's memorandum only amounts to a general objection to an award of attorney fees and does not request a hearing on these fees. Furthermore, respondent had ample

opportunity to make a specific request for this hearing either (1) after both parties filed their memoranda with the trial court in January 1993 and before the court entered its order in April 1993, or (2) within the post-trial motion for reconsideration that he filed after the April 1993 order. Therefore, we conclude that respondent has waived his right for a hearing on these attorney fees. See *Jones*, 187 Ill. App. 3d at 231, 543 N.E.2d at 136.

## III. CONCLUSION

For the reasons stated, we affirm all aspects of the circuit court's judgment.

Affirmed.

LUND and GREEN, JJ., concur.