*In re* MARRIAGE OF JUDITH E. WALKER, Petitioner-Appellant, and JAMES E. WALKER, Respondent-Appellee.

Fourth District   No. 4—98—0690

Argued February 10, 1999.—Opinion filed April 15, 1999.

224

Donald A. Behle (argued), of Law Offices of Behle & Turner, of Lincoln, for appellant.

Roger W. Thompson (argued), of Lincoln, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:
Judith and James Walker were married on May 7, 1994. No chil-

dren were born of the marriage. The marriage was dissolved on March 19, 1997. On appeal, Judith and James dispute the trial court's disposition of James' thrift incentive plan under section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 1996)). The trial court awarded Judith $17,643 as her share of the marital interest in the plan. The trial court ordered this amount to be paid to Judith under a qualified domestic relations order (QDRO), effective the date of dissolution. We affirm.

On January 12, 1998, the trial court held a hearing on property distribution issues. On August 5, 1998, the trial court entered the supplemental property distribution order. The trial court split the nonpension marital property fairly equally. The trial court awarded Judith her pension. Judith earns $13,036 per year working full-time as a high school secretary and part-time in a restaurant. Judith has worked at the high school for 25½ years.

Finally, the trial court awarded Judith $17,643 as her share of the marital interest in James' thrift plan, to be allocated according to a QDRO, effective March 19, 1997. James had worked for Prairie Farms Dairy (Prairie Farms) for about 20½ years and, at the time of the January 12, 1998, hearing was a transportation coordinator. Evidence regarding the value of the thrift plan was presented in testimony by James at the January 12, 1998, hearing and in testimony given by Kris Rosentreter, Prairie Farms' payroll coordinator, at a separate hearing on February 9, 1998. According to James' August 4, 1997, financial affidavit, he earns approximately $48,012 per year. According to Rosentreter, James earned $43,200 (gross) in the fiscal year ending on September 30, 1994 (FY 1994); $43,800 for FY 1995; $46,680 for FY 1996; and $48,380 for FY 1997.

James testified that he has contributed 2% of his salary into an "employee account" in the pension plan for 19 years, and Prairie Farms also contributes into an "employer account" in the plan. Rosentreter testified that the employer contribution is subject to change but, for the past 12 years, the employer contributions had been 15% of the employee's wages. Rosentreter testified the value of the employer account fluctuates from financial quarter to financial quarter. According to Rosentreter, the money is managed by a trust company, and he has no record of individual investments throughout the year. Rosentreter testified James was fully vested in his plan.

Rosentreter read from a summary of financial figures he had compiled regarding James' thrift plan. Because these figures were only available on a quarterly basis, Rosentreter was unable to present the total accumulated earnings on May 7, 1994, the date of the marriage. As of March 31, 1994, the thrift plan contained a total of $165,549

($148,708 in the employer account and $16,841 in employee contributions). As of June 30, 1994, the thrift plan contained a total of $164,550 ($147,375 in the employer account and $17,175 in employee contributions). Both parties agree the pension's value at the date of marriage is $165,050, the average of these two estimates.

As of September 30, 1997, the pension was worth $302,540 ($278,777 in the employer account and $23,763 in employee contributions). Rosentreter estimated employee contributions for May 7, 1994, through December 2, 1997, to be $3,361, and employer contributions to be $27,125, though he mentioned several potential errors in these estimates. Rosentreter testified part of the increase in any given year is due to appreciation of contributions from prior years, including years before the marriage. Rosentreter testified that if a QDRO were entered, splitting the parties' interest in the thrift plan, a separate account would be set up for Judith, and she would be able to withdraw her funds when James began withdrawing his.

■ Both parties agree James' thrift plan is to be treated as a pension. Apportioning a pension in a marital dissolution is a three-step process. First, the trial court determines the present value of the pension, with a discount to reflect the possibility it will not vest. Second, the court determines the marital interest in the property. Third, the trial court divides that marital interest, just as it would divide any other marital property. *In re Marriage of Wisniewski,* 107 Ill. App. 3d 711, 717, 437 N.E.2d 1300, 1305 (1982).

The trial court determined the value of the pension on the date of dissolution by extrapolation, based on its average increase in value over time. In calculating the average increase, the trial court erroneously divided the total value of the plan by the months of marriage. Instead, it should have divided the change in the value of the plan ($302,540 minus $165,050) by the number of months in which that change occurred (40). After correcting for this error, the estimated value of the pension plan on the date of dissolution was $280,782.

Judith argues the trial court erred in using the value of the thrift plan as of the date of dissolution instead of the value as of the date of the most recent estimate. She argues this deprives her of the growth in the value of marital contributions after the dissolution. See *In re Marriage of Wisniewski,* 286 Ill. App. 3d 236, 244, 675 N.E.2d 1362, 1369-70 (1997); *In re Marriage of Wenc,* 294 Ill. App. 3d 239, 246, 689 N.E.2d 424, 428 (1998). Rosentreter testified that once a QDRO is entered, the parties' interests are split into separate accounts but remain invested in the pension. The value of Judith's marital share will continue to grow before it is paid out through the QDRO.

■ Both parties agree that $165,050, the pension's value at the

date of marriage, is James' nonmarital property (see 750 ILCS 5/503(a)(6) (West 1996)). The primary dispute in this case is over how to treat the increase in the value of the pension during the marriage. Any increase in the value of James' pre-marital contributions would be nonmarital, as well. 750 ILCS 5/503(a)(7) (West 1996). Pension benefits attributable to contributions during the marriage are marital property. *In re Marriage of Smith*, 102 Ill. App. 3d 769, 772, 430 N.E.2d 364, 366 (1981). A trial court's method of determining the marital interest in a pension will only be reversed if it constitutes an abuse of discretion. *In re Marriage of Blazis*, 261 Ill. App. 3d 855, 863, 634 N.E.2d 1295, 1300-01 (1994).

James argues the trial court should determine the marital interest by multiplying the pension benefit by the ratio of years of marital participation to total years of participation. See *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979). *Hunt* reflects a long line of cases that holds the trial court may use some formula based on contributions or years of participation in a pension plan to estimate the marital share of a pension. See *Wisniewski*, 286 Ill. App. 3d at 242, 675 N.E.2d at 1367.

However, another line of cases has held that a pension should be apportioned under statutory standards for commingled marital and nonmarital property (750 ILCS 5/503(c) (West 1996)). See *In re Marriage of Leisner*, 219 Ill. App. 3d 752, 764, 579 N.E.2d 1091, 1098-99 (1991); *In re Marriage of DiAngelo*, 159 Ill. App. 3d 293, 296-98, 512 N.E.2d 783, 785-86 (1987). The second district recently reconciled these cases, holding the *Leisner* approach should be used where, as here, the majority of the value of the pension accrues prior to the marriage. *In re Marriage of Raad*, 301 Ill. App. 3d 683, 686-87, 704 N.E.2d 964, 966 (1998). We agree with *Raad*.

Judith argues that, under *Leisner*, James is required to trace non-marital contributions to the pension by clear and convincing evidence. Because he was not able to do so, Judith argues, the entire increase in the value of the pension during the marriage should be attributed to marital contributions, effectively freezing James' nonmarital interest at its value at the time of marriage.

■ Even if section 503(c) is applicable here, under *Leisner*, it provides no guidance on how to determine the marital interest in the pension. Under the Act, when one estate contributes to another such that the estates become commingled, the contributing estate is required to trace its contributions by clear and convincing evidence in order to receive reimbursement. 750 ILCS 5/503(c)(2) (West 1996). Here, James' premarital contributions to his pension plan would not be a contribution to the marital estate. Rather, James' effort during

the marriage would be a marital contribution to his nonmarital pension that predated the marriage. See *DiAngelo*, 159 Ill. App. 3d at 297, 512 N.E.2d at 786; *In re Marriage of Harmon*, 133 Ill. App. 3d 673, 675-76, 479 N.E.2d 422, 424-25 (1985).

■ If section 503(c) applies, the commingled property became entirely nonmarital, subject to the marital estate's right of reimbursement. James' pension plan is a form of compensation for marital effort. Because the effort was significant, and resulted in substantial appreciation of the nonmarital pension, Judith was not required to trace marital contributions by clear and convincing evidence. 750 ILCS 5/503(c)(2) (West 1996). The trial court was free to use an estimate.

From the evidence presented at trial, the trial court could have estimated the marital interest in the pension in one of two ways. First, using the *Hunt* formula, the marital interest in the pension would be calculated by multiplying the value of the pension on the date of dissolution by the ratio of months of marital contribution to total months of contribution prior to dissolution as follows:

$280,782 x (36 months/246 months) = $41,090.05.

Alternatively, the trial court could have determined the marital interest in the pension by multiplying the value of the pension by the ratio of contributions during the marriage to total contributions. See *In re Marriage of Benz*, 165 Ill. App. 3d 273, 284, 518 N.E.2d 1316, 1322 (1988). From Rosentreter's testimony regarding James' salary, his total salary during the marriage amounted to approximately:

$1/3$ x $43,200 (for FY 1994) + $43,800 (for FY 1995) + $46,680 (for FY 1996) + $1/2$ x $48,380 (for FY 1997) = $129,070.

The marital contributions to the pension plan were 17% of James' salary for the period (2% in the employee account and 15% in the employer account). This comes to $21,942. Adding this to James' premarital contribution of $165,050 yields total contributions of $186,992. Under the *Benz* approach, the marital share would be as follows:

$280,782 x ($21,942/$186,992) = $32,947.50.

The trial court could also have used Rosentreter's admittedly flawed estimate that the contributions of both employer and employee over the marriage were $30,486 ($3,361 + $27,125). Using this figure, total contributions to the pension prior to dissolution would be $195,536. Under the *Benz* approach, the marital share would be as follows:

$280,782 x ($30,486/$195,536) = $43,776.70.

Again, Judith argues such estimates of the marital interest in the pension plan fail to account for fluctuations in its market value. Judith provided no better evidence for determining the marital interest

in the plan. Again, where parties have had the opportunity to present evidence at trial, they should not be allowed on appeal to take advantage of their failure to do so. *Wisniewski*, 286 Ill. App. 3d at 246, 675 N.E.2d at 1370.

◼ Finally, after the marital interest in the thrift plan is determined, the trial court must divide this interest between the parties as it would divide any other marital property. *Wisniewski*, 286 Ill. App. 3d at 240, 675 N.E.2d at 1366. Section 503(d) of the Act (750 ILCS 5/503(d) (West 1996)) requires the trial court to divide the marital property in just proportions. The trial court's decision will be upheld unless it amounts to a clear abuse of discretion. *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 831, 633 N.E.2d 82, 94 (1994).

◼ Here, the trial court's award of $17,643 as her share of James' pension plan was not an abuse of discretion nor against the manifest weight of the evidence. If the *Hunt* approach is used, the trial court awarded Judith 42.9% of the marital interest in the pension. If the *Benz* approach is used and contributions are estimated from James' salary, the trial court awarded Judith 53.5% of the marital interest in the pension. If the *Benz* approach is used and Rosentreter's estimate of contributions is used, the trial court awarded Judith 40.3% of the marital interest in the pension.

Even if Judith received only about 40% of the marital interest in the pension, the trial court's decision was within its discretion. "Just proportions" does not mean mathematically equal shares. *In re Marriage of Thomas*, 239 Ill. App. 3d 992, 996, 608 N.E.2d 585, 588 (1993). In apportioning the marital estate, the trial court could consider that Judith was awarded all of the marital interest in her own pension. Also, the trial court may consider the short duration of the marriage (750 ILCS 5/503(d)(4) (West 1996)) and James' contribution to the asset (750 ILCS 5/503(d)(1) (West 1996)). While the *Benz* approach to calculating the marital interest in the pension automatically compensates for James' nonmarital contribution to the asset, it does not automatically compensate for the short duration of the marriage. The opposite is true of the *Hunt* approach.

Judith argues the trial court improperly considered the potential for a windfall to her due to the dramatically increased value of the pension during the short marriage. In support of this point, she cites *In re Marriage of Morris*, 266 Ill. App. 3d 277, 283, 640 N.E.2d 344, 348 (1994), in which the trial court erred by failing to award a spouse a share of lottery winnings from a ticket purchased during the marriage but 20 years after the parties separated. This case differs from *Morris*, in which the factors listed by section 503(d) supported the windfall award. *Morris*, 266 Ill. App. 3d at 283, 640 N.E.2d at 348. The

factors listed in section 503(d) of the Act favor a limited award for Judith here.

For all of the above reasons, we affirm.

Affirmed.

COOK and MYERSCOUGH, JJ., concur.