April 15, 1999

NO. 4-98-0690

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In Re:  the Marriage of )  Appeal from

JUDITH E. WALKER, )  Circuit Court of

Petitioner-Appellant, )  Logan County

and )  No. 96D197

JAMES E. WALKER, )

Respondent-Appellee. )  Honorable

)  Gerald G. Dehner,

)  Judge Presiding.

_________________________________________________________________

JUSTICE McCULLOUGH delivered the opinion of the court:

Judith and James Walker were married on May 7, 1994.  No children were born of the marriage.  The mar­riage was dis­solved on March 19, 1997.  On appeal, Judith and James dispute the trial court's disposition of James' thrift incentive plan under section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 1996)).  The trial court awarded Judith $17,643 as her share of the marital interest in the plan.  The trial court ordered this amount to be paid to Judith under a quali­fied domes­tic rela­tions order (QDRO), effec­tive the date of dissolu­tion.  We affirm.

On January 12, 1998, the trial court held a hearing on property distribution issues.  On August 5, 1998, the trial court entered the supple­men­tal proper­ty distri­bu­tion order.  The trial court split the nonpension marital property fairly equally.  The trial court awarded Judith her pension.  Judith earns $13,036 per year working full-time as a high school secre­tary and part-time 

in a restau­rant.  Judith has worked at the high school for 25½ years.

Finally, the trial court awarded Judith $17,643 as her share of the marital interest in James' thrift plan, to be allocated accord­ing to a QDRO, effec­tive March 19, 1997.  James had worked for Prairie Farms Dairy (Prai­rie Farms) for about 20½ years and, at the time of the January 12, 1998, hearing was a trans­por­ta­tion coordi­na­tor.  Evi­dence regard­ing the value of the thrift plan was pre­sent­ed in testi­mony by James at the January 12, 1998, hearing and in testi­mo­ny given by Kris Rosentreter, Prairie Farms' payroll coordina­tor, at a separate hearing on February 9, 1998.  Accord­ing to James' August 4, 1997, financial affidavit, he earns approx­i­mately $48,012 per year.  According to Rosentreter, James earned $43,200 (gross) in the fiscal year ending on Septem­ber 30, 1994 (FY 1994); $43,800 for FY 1995; $46,680 for FY 1996; and $48,380 for FY 1997.  

James testified that he has contributed 2% of his salary into an "employee account" in the pension plan for 19 years, and Prairie Farms also con­trib­utes into an "employer account" in the plan.  Rosentreter testi­fied that the employ­er contri­bution is subject to change but, for the past 12 years, the employ­er contri­bu­tions had been 15% of the employee's wages.  Rosentreter testi­fied the value of the employ­er account fluctu­ates from finan­cial quarter to finan­cial quar­ter.  Accord­ing to Rosentreter, the money is managed by a trust compa­ny, and he has no record of individual investments through­out the year.  Rosentreter testi­fied James was fully vested in his plan.

Rosentreter read from a summary of financial figures he had com­piled regarding James' thrift plan.  Because these figures were only avail­able on a quar­ter­ly basis, Rosentreter was unable to present the total accumu­lated earnings on May 7, 1994, the date of the marriage.  As of March 31, 1994, the thrift plan contained a total of $165,549 ($148,708 in the employ­er account and $16,841 in employee contribu­tions).  As of June 30, 1994, the thrift plan con­tained a total of $164,550 ($147,375 in the employer account and $17,175 in employee contri­bu­tions).  Both parties agree the pension's value at the date of marriage is $165,050, the average of these two esti­mates.

As of September 30, 1997, the pension was worth $302,540 ($278,777 in the employer account and $23,763 in employ­ee contri­butions).  Rosentreter estimated employee contri­butions for May 7, 1994, through December 2, 1997, to be $3,361, and employer contri­

bu­tions to be $27,125, though he mentioned several poten­tial errors in these estimates.  Rosentreter testi­fied part of the in­crease in any given year is due to apprecia­tion of contri­bu­

tions from prior years, includ­ing years before the marriage.  Rosentreter testi­fied that if a QDRO were en­tered, splitting the parties' interest in the thrift plan, a separate account would be set up for Judith, and she would be able to withdraw her funds when James began with­

drawing his.

Both parties agree James' thrift plan is to be treated as a pension.  Appor­tioning a pension in a marital disso­lu­tion is a three-step pro­cess.  First, the trial court deter­mines the present value of the pension, with a dis­count to reflect the possibility it will not vest.  Second, the court determines the marital interest in the property.  Third, the trial court divides that marital interest, just as it would divide any other marital property.  
In re Marriage of Wisniewski
, 107 Ill. App. 3d 711, 717, 437 N.E.2d 1300, 1305 (1982).

The trial court determined the value of the pension on the date of dissolution by extrapolation, based on its average increase in value over time.  In calculating the average in­

crease, the trial court erroneously divided the total value of the plan by the months of marriage.  Instead, it should have divided the change in the value of the plan ($302,540 minus $165,050) by the number of months in which that change occurred (40).  After correcting for this error, the estimated value of the pension plan on the date of dissolution was $280,782.  

Judith argues the trial court erred in using the value of the thrift plan as of the date of dissolu­tion instead of the value as of the date of the most recent estimate.  She argues this de­prives her of the growth in the value of marital contri­butions after the dissolu­tion.  See 
In re Marriage of Wisniewski
, 286 Ill. App. 3d 236, 244, 675 N.E.2d 1362, 1369-70 (1997); 
In re Mar­riage of Wenc
, 294 Ill. App. 3d 239, 246, 689 N.E.2d 424, 428 (1998).  Rosentreter testified that once a QDRO is entered, the parties' interests are split into separate ac­counts but remain invested in the pension.  The value of Judith's marital share will contin­ue to grow before it is paid out through the QDRO.

Both parties agree that $165,050, the pension's value at the date of marriage, is James' nonmarital proper­ty (see 750 ILCS 5/503(a)(6) (West 1996)).  The primary dispute in this case is over how to treat the increase in the value of the pension during the marriage.  Any in­crease in the value of James' pre-marital contributions would be nonmarital, as well.  750 ILCS 5/503(a)(7) (West 1996).  Pension benefits attrib­utable to contribu­tions during the mar­riage are marital property.  
In re Marriage of Smith
, 102 Ill. App. 3d 769, 772, 430 N.E.2d 364, 366 (1981).  A trial court's method of deter­mining the marital inter­est in a pen­

sion will only be reversed if it constitutes an abuse of discre­tion.  
In re Mar­riage of Blazis
, 261 Ill. App. 3d 855, 863, 634 N.E.2d 1295, 1300-01 (1994). 

James argues the trial court should determine the marital inter­est by multiplying the pension benefit by the ratio of years of marital participa­tion to total years of partic­ipa­tion.  See 
In re Marriage of Hunt
, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979).  
Hunt
 reflects a long line of cases that holds the trial court may use some formula based on contributions or years of partici­pation in a pension plan to estimate the marital share of a pen­

sion.  See 
Wisniewski
, 286 Ill. App. 3d at 242, 675 N.E.2d at 1367.

However, another line of cases has held that a pension should be apportioned under statutory standards for commingled marital and nonmarital proper­ty (750 ILCS 5/503(c) (West 1996)).  See 
In re Marriage of Leisner
, 219 Ill. App. 3d 752, 764, 579 N.E.2d 1091, 1098-99 (1991); 
In re Marriage of DiAngelo
, 159 Ill. App. 3d 293, 296-98, 512 N.E.2d 783, 785-86 (1987).  The second dis­trict recent­ly reconciled these cases, holding the 
Leisner
 ap­

proach should be used where, as here, the majority of the value of the pension accrues prior to the mar­riage.  
In re Marriage of Raad
, 301 Ill. App. 3d 683, 686-87, 704 N.E.2d 964, 966 (1998).  We agree with 
Raad
.

Judith argues that, under 
Leisner
, James is re­quired to trace nonmarital contribu­tions to the pension by clear and convincing evidence.  Because he was not able to do so, Judith argues, the entire increase in the value of the pension during the marriage should be attrib­uted to marital contribu­tions, effectively freezing James' nonmarital interest at its value at the time of marriage.

Even if section 503(c) is applicable here, under 
Leisner
, it pro­vides no guidance on how to deter­mine the marital interest in the pension.  Under the Act, when one estate con­

trib­utes to anoth­er such that the estates become commingled, the contrib­ut­ing estate is re­quired to trace its contributions by clear and convincing evi­dence in order to receive reimbursement.  750 ILCS 5/503(c)(2) (West 1996).  Here, James' premarital contributions to his pension plan would not be a contri­bu­tion to the marital estate.  Rather, James' effort during the marriage would be a marital contribu­tion to his nonmarital pension that predated the marriage.  See 
DiAngelo
, 159 Ill. App. 3d at 297, 512 N.E.2d at 786; 
In re Marriage of Harmon
, 133 Ill. App. 3d 673, 675-76, 479 N.E.2d 422, 424-25 (1985).  

If section 503(c) applies, the commingled proper­ty became entire­ly nonmarital, subject to the marital estate's right of reim­bursement.  James' pension plan is a form of compen­sation for marital effort.  Because the effort was signifi­cant, and resulted in substantial appreciation of the nonmarital pension, Judith was not required to trace marital contri­butions by clear and con­vinc­ing evi­dence.  750 ILCS 5/503(c)(2) (West 1996).  The trial court was free to use an esti­mate.

From the evidence presented at trial, the trial court could have estimated the marital interest in the pension in one of two ways.  First, using the 
Hunt
 formu­la, the marital inter­est in the pension would be calculated by multiply­ing the value of the pension on the date of dissolu­tion by the ratio of months of marital contri­bution to total months of contribution prior to dissolution as follows:

$280,782 x (36 months/246 months) = $41,090.05.

Alternatively, the trial court could have determined the marital interest in the pension by multiplying the value of the pension by the ratio of contributions during the marriage to total contributions.  See 
In re Mar­riage of Benz
, 165 Ill. App. 3d 273, 284, 518 N.E.2d 1316, 1322 (1988).  From Rosentreter's testimony regard­ing James' salary, his total salary during the marriage amounted to approxi­mately:

1/3 x $43,200 (for FY 1994) + $43,800 (for FY 1995) + $46,680 (for FY 1996) + 1/2 x $48,380 (for FY 1997) = $129,070.

The marital contri­butions to the pension plan were 17% of James' salary for the period (2% in the employee account and 15% in the employ­er account).  This comes to $21,942.  Adding this to James' premarital contribution of $165,050 yields total contribu­tions of $186,992.  Under the 
Benz
 approach, the marital share would be as follows:

$280,782 x ($21,942/$186,992) = $32,947.50.

The trial court could also have used Rosentreter's admittedly flawed estimate that the contributions of both employ­er and employ­ee over the marriage were $30,486 ($3,361 + $27,125).  Using this figure, total contributions to the pension prior to dissolu­tion would be $195,536.  Under the 
Benz
 ap­proach, the marital share would be as follows:

$280,782 x ($30,486/$195,536) = $43,776.70.

Again, Judith argues such estimates of the marital inter­est in the pension plan fail to account for fluctuations in its market value.  Judith provided no better evidence for deter­min­ing the marital interest in the plan.  Again, where parties have had the oppor­tu­ni­ty to present evi­dence at trial, they should not be allowed on appeal to take advantage of their failure to do so.  
Wisniewski
, 286 Ill. App. 3d at 246, 675 N.E.2d at 1370.

Finally, after the marital interest in the thrift plan is deter­mined, the trial court must divide this interest between the parties as it would divide any other marital property.  
Wisniewski
, 286 Ill. App. 3d at 240, 675 N.E.2d at 1366.  Section 503(d) of the Act (750 ILCS 5/503(d) (West 1996)) requires the trial court to divide the marital proper­ty in just proportions.  The trial court's decision will be upheld unless it amounts to a clear abuse of discretion.  
In re Marriage of Dunseth
, 260 Ill. App. 3d 816, 831, 633 N.E.2d 82, 94 (1994).  

Here, the trial court's award of $17,643 as her share of James' pension plan was not an abuse of discretion nor against the manifest weight of the evidence.  If the 
Hunt
 ap­

proach is used, the trial court awarded Judith 42.9% of the marital inter­est in the pen­sion.  If the 
Benz
 ap­proach is used and contri­butions are estimated from James' salary, the trial court awarded Judith 53.5% of the marital inter­est in the pen­sion.  If the 
Benz
 approach is used and Rosentreter's esti­mate of contri­butions is used, the trial court awarded Judith 40.3% of the marital inter­est in the pen­sion.

Even if Judith received only about 40% of the marital interest in the pension, the trial court's decision was within its discre­tion.  "Just propor­tions" does not mean mathe­

mati­cally equal shares.  
In re Marriage of Thomas
, 239 Ill. App. 3d 992, 996, 608 N.E.2d 585, 588 (1993).  In apportioning the marital estate, the trial court could consid­er that Judith was awarded all of the marital inter­est in her own pen­sion.  Also, the trial court may consider the short dura­tion of the mar­riage (750 ILCS 5/503(d)(4) (West 1996)) and James' contri­

bution to the asset (750 ILCS 5/503(d)(1) (West 1996)).  While the 
Benz
 ap­proach to calcu­lat­

ing the marital inter­est in the pension auto­mat­i­cal­ly compen­sates for James' nonmarital contri­

bution to the asset, it does not auto­matically compen­sate for the short dura­tion of the marriage.  The opposite is true of the 
Hunt
 approach.

Judith argues the trial court improperly consid­ered the potential for a wind­fall to her due to the dramatically increased value of the pension during the short mar­riage.  In support of this point, she cites 
In re Mar­riage of Morris
, 266 Ill. App. 3d 277, 283, 640 N.E.2d 344, 348 (1994), in which a the trial court erred by failing to award a spouse a share of lottery winnings from a ticket pur­chased during the marriage but 20 years after the parties separated.  This case differs from 
Morris
, in which the factors listed by section 503(d) supported the windfall award.  
Morris
, 266 Ill. App. 3d at 283, 640 N.E.2d at 348.  The factors listed in section 503(d) of the Act favor a limited award for Judith here.

For all of the above reasons, we affirm.

Affirmed.

COOK and MYERSCOUGH, JJ., concur.